UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAMPAIGN LEGAL CENTER and DEMOCRACY 21**,<br><br>Plaintiffs,<br><br>v.<br><br>**FEDERAL ELECTION COMMISSION**,<br><br>Defendant,<br><br>**RIGHT TO RISE SUPER PAC, INC.**,<br><br>Intervenor-Defendant. | Case No. 20-cv-00730 |

## MEMORANDUM OPINION

While Jeb Bush's unsuccessful 2016 presidential campaign may seem like a footnote in political history given all that has transpired since, it continues to attract the attention of organizations dedicated to exposing violations of federal campaign finance laws.  Election junkies will recall that before the former Florida governor formally launched his candidacy in the summer of 2015, the Right to Rise super PAC, which directly supported his run, had already amassed approximately $90 million in donations.  The accumulation of such a large war chest, coupled with Mr. Bush's fundraising activities and travels to early primary states in advance of his official announcement, raised the eyebrows of watchdog groups Campaign Legal Center and Democracy 21.  Suspecting that the Bush campaign and Right to Rise were improperly coordinating their efforts and thereby violating applicable contribution limits and disclosure requirements, the groups filed administrative complaints with the Federal Election Commission ("FEC").  But the complaints languished without action for nearly five years.  Undaunted, the groups sued the FEC in this Court to compel the agency to investigate the asserted violations.

They bring claims under the Federal Election Campaign Act ("FECA") and the Administrative Procedure Act ("APA").

Right to Rise intervened as a defendant in the case and now moves to dismiss. It contends that plaintiffs lack standing to bring a FECA claim because they have not suffered a cognizable injury. And it argues that plaintiffs' APA claim is foreclosed by the availability of judicial review under FECA. Finding that plaintiffs have plausibly alleged an informational injury, the Court concludes that they have standing to sue and will exercise jurisdiction over their FECA claim. The Court agrees with Right to Rise, however, that the complaint fails to state a claim under the APA.

## I. Background

### A. Procedural Background

Plaintiffs Campaign Legal Center and Democracy 21 claim that the FEC has failed to act on their administrative complaints alleging that John Ellis ("Jeb") Bush and defendant-intervenor Right to Rise Super PAC, Inc., violated provisions of the Federal Election Campaign Act over the course of Bush's 2016 presidential bid. Specifically, plaintiffs assert that Bush coordinated with Right to Rise in an attempt to contravene FECA's "soft money" prohibition, which provides that any entity "established, financed, maintained or controlled by or acting on behalf of" a federal candidate must abide by FECA's "limitations, prohibitions, and reporting requirements[.]" 52 U.S.C. § 30125(e)(1); see Compl. ¶ 2, ECF No. 1.

In the spring of 2015, plaintiffs lodged two complaints with the FEC detailing their concerns. Compl. ¶ 4. First, in March 2015, plaintiffs filed a complaint alleging that Bush failed to abide by FECA's (i) "testing-the-waters" disclosure requirements, (ii) campaign contribution limits, (iii) candidate registration requirements, and (iv) soft money prohibition. Compl. Ex. B,

Mar. Admin. Compl., ECF No. 1-2 ("Mar. Admin. Compl."). A few months later, plaintiffs filed another complaint making similar allegations and expanding upon its claim that Bush "established" and "controlled" Right to Rise to raise millions of dollars on his behalf without regard to FECA's contribution limits and source prohibitions. Compl. Ex. A, May Admin. Compl., ECF No. 1-1 ("May Admin. Compl."). Plaintiffs requested that the FEC "undertake an investigation under 52 U.S.C. § 30109 of respondents Bush and [Right to Rise] to determine whether [they] have violated the law by accepting contributions or making expenditures with funds raised in excess of the applicable limits under" FECA. Id. at 17 (citing 52 U.S.C. § 30116(a)(1) and 11 C.F.R. § 110.3).

Plaintiffs' administrative complaints sat without action for nearly five years. Plaintiffs responded by filing the present complaint seeking injunctive and declaratory relief to compel the FEC to take up the complaints. See Compl. ¶ 2. Plaintiffs allege that the Commission's inaction has deprived them of information on the extent of coordination between Right to Rise and the Bush campaign, id. ¶ 9, and the extent of Bush's campaign spending "both during the testing the waters phase of his campaign and after . . . Bush had moved beyond testing the waters to become a candidate under FECA," id. ¶ 10 (cleaned up). Plaintiffs also allege that they have suffered organizational injuries as a result of the FEC's inaction, because inadequate disclosure of federal campaign finance activity diverts funds and resources from other organizational needs. Id. ¶¶ 19, 22.

Plaintiffs bring two counts to redress their alleged injuries. In Count I, they claim that the FEC's "failure to act on plaintiffs' administrative complaints within 120 days of their filing was contrary to law" under FECA. Id. ¶ 37 (citing 52 U.S.C. § 30109(a)(8)(A)). And in Count II,

they contend that the same inaction constitutes "unlawfully withheld and unreasonably delayed agency action under 5 U.S.C. § 706(1)" of the APA.  Id. ¶ 39.

Since the filing of plaintiffs' complaint, the FEC has neither acted on plaintiffs' administrative complaints nor entered an appearance in this lawsuit.  In June 2020, Right to Rise moved to intervene as a defendant, which the Court promptly permitted.  See Mot. to Intervene, ECF No. 9; June 8, 2020, Min. Order.  Right to Rise then moved to dismiss plaintiffs' complaint on the grounds that plaintiffs lack standing to bring their FECA claim and that their APA claim is precluded by FECA's comprehensive judicial review provisions.  See Mot. to Dismiss, ECF No. 11.  Right to Rise's motion is ripe for the Court's review.

    B.  Statutory Scheme

The Court will first describe FECA's pertinent campaign finance and disclosure requirements before turning to its enforcement provisions.

        *1.  FECA requirements*

FECA was passed in 1971 to "remedy any actual or perceived corruption in the political process[.]"  FEC v. Akins, 524 U.S. 11, 14 (1998).  To that end, FECA "imposes limits upon the amounts that individuals, corporations, 'political committees' (including political action committees), and political parties can contribute to a candidate for federal political office."  Id.; see 52 U.S.C. § 30116(a) (listing limitations on contributions and expenditures); see also 11 C.F.R. §§ 300.60, 300.61.  Additionally, FECA "imposes limits on the amount these individuals or entities can spend in coordination with a candidate," and treats coordinated expenditures as "contributions" under the Act.  Akins, 524 U.S. at 14; see 52 U.S.C. § 30101(8)(A) (defining "contribution" to include "anything of value [given] by any person for the purpose of influencing any election for Federal office," as well as "the payment by any person of compensation for the

personal services of another person which are rendered to a political committee without charge for any purpose"); see also FEC v. Colo. Republican Fed. Campaign Comm., 533 U.S. 431, 438 (2001) ("Expenditures coordinated with a candidate . . . are contributions under the Act."). FECA incorporates coordinated expenditures in order to "prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." Buckley v. Valeo, 424 U.S. 1, 47 (1976). By definition, coordinated expenditures are "in-kind contributions, as opposed to direct financial ones, since they are services rendered to the campaign." Campaign Legal Ctr. v. FEC, 466 F. Supp. 3d 141, 146 (D.D.C. 2020) ("CLC II").

FECA imposes certain disclosure and reporting requirements on anyone who becomes a "candidate," which FECA defines as "an individual who seeks nomination for election, or election, to Federal office," 52 U.S.C. § 30101(2), including any individual who has accumulated an aggregate of over $5,000 in contributions or expenditures, id. § 30101(2)(A); see also 11 C.F.R. § 100.3(a); 52 U.S.C. § 30101(8)(A) (defining contribution); id. § 30101(9)(A) (defining expenditure). Individuals must register with the FEC within ten days of qualifying as a candidate under FECA. See 52 U.S.C. § 30103(a). Within fifteen days of so qualifying, candidates must designate a principal campaign committee, id. § 30102(e)(1), which, in turn, must regularly file comprehensive reports that disclose their receipts and disbursements, id. § 30104(a).

FECA contains limited exceptions to the $5,000 threshold for individuals wishing to "test the waters" of a potential candidacy. See 11 C.F.R. §§ 100.72, 100.131 (testing-the-waters exceptions). The testing-the-waters exceptions permit would-be candidates to evaluate the feasibility of candidacy without triggering candidate status when the funds they raise or spend for that purpose exceed $5,000. See id. That said, potential candidates must record all funds received and payments made pursuant to the testing-the-waters exceptions and, should they

5

eventually become a candidate, disclose those transactions in their principal campaign committee's first report.  Id. § 101.3.

FECA's testing-the-waters exceptions do not apply to individuals who have decided (either privately or publicly) that they will run for office.  Id. §§ 100.72(b); 100.131(b); see also FEC Adv. Op. 1981-32 (Oct. 2, 1981).  The regulations thus attempt to distinguish between activities that "indicate that a decision has been made to seek nomination for election, or election, to a Federal office" from those that indicate that an individual is truly "continuing to deliberate whether [he or she] should actually seek elective Federal office." Id. at 4.  "Examples of activities that indicate that an individual has decided to become a candidate include, but are not limited to" activities in which "[t]he individual raises funds in excess of what could reasonably be expected to be used for exploratory activities or undertakes activities designed to amass campaign funds that would be spent after he or she becomes a candidate" and "[t]he individual makes or authorizes written or oral statements that refer to him or her as a candidate for a particular office." 11 C.F.R. § 100.72(b).

In addition to the testing-the-waters exceptions, a carveout to certain of FECA's terms exists for so-called super PACs.  Super PACs are political committees that are permitted to fundraise largely uninhibited by FECA's source restrictions and contribution limitations so long as they make exclusively independent expenditures and do not coordinate with any candidate. SpeechNow.org v. FEC, 599 F.3d 686, 689 (D.C. Cir. 2010) (en banc).  By contrast, FECA subjects any entity "directly or indirectly established, financed, maintained or controlled by or acting on behalf of [one] or more candidates" to FECA's "limitations, prohibitions and reporting requirements" when such an entity "solicit[s], receive[s], direct[s], transfer[s], or spend[s] funds in connection with an election for Federal office." 52 U.S.C. § 30125(e)(l).  In campaign finance

parlance, § 30125(e)(l) prohibits candidates from relying on "soft money" as a means of circumventing the terms of FECA.

    2. *FECA enforcement*

The FEC—an independent agency with six Commissioners—is responsible for enforcing FECA. See 52 U.S.C. § 30106(b)(1). Any person or entity that believes FECA has been violated may file a complaint with the FEC. Id. § 30109(a)(1). If four or more Commissioners find "reason to believe" that FECA was or will soon be violated, then the Commission must investigate the complaint. Id. § 30109(a)(2). Otherwise, the complaint is dismissed. See id. § 30106(c). "Any party aggrieved by an order of the [FEC] dismissing a complaint filed by such party . . . or by a failure of the [FEC] to act on such complaint during the 120-day period beginning on the date the complaint is filed, may file a petition" in this court. Id. § 30109(a)(8)(A).

**II.  Legal Standard**

Right to Rise seeks dismissal of plaintiffs' complaint for both lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and failure to state a claim under Fed. R. Civ. P. 12(b)(6).

When analyzing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, courts must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged." Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up). That said, courts need not accept plaintiffs' bare legal conclusions nor unsupported inferences. See, e.g., Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002). To overcome a Rule 12(b)(1) motion, plaintiffs must show "by a preponderance of the evidence that the Court has

subject matter jurisdiction to hear [the] case." Biton v. Palestinian Interim Self-Gov't Auth., 310 F. Supp. 2d 172, 176 (D.D.C. 2004).

When analyzing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must determine whether the complaint "contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Citizens for Resp. & Ethics in Wash. v. Am. Action Network, 410 F. Supp. 3d 1, 11–12 (D.D.C. 2019) (Cooper, J.) (cleaned up) ("AAN"). "To make this determination, the Court must take all of the factual allegations in the complaint as true and must construe the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged." Id. (cleaned up).

### III. Analysis

#### A. Informational Injury

Right to Rise first challenges plaintiffs' standing to bring their claims. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy" in Article III of the Constitution. Spokeo, Inc. v. Robins, ––– U.S. –––, 136 S. Ct. 1540, 1547 (2016). Article III's "case or controversy" limitation thus forms the basis of constitutional standing doctrine, see Akins, 524 U.S. at 20, and requires the plaintiff to show that he or she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, 136 S. Ct. at 1547. An injury in fact must be both "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical[.]" Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000). A "concrete" injury must be "real," rather than "abstract," and a "particularized" injury must "affect the plaintiff in a personal and individual way." Spokeo, 136 S. Ct. at 1548 (cleaned up).

Right to Rise's Rule 12(b)(1) motion focuses on the first element of plaintiffs' burden to establish standing—whether plaintiffs have demonstrated an "injury in fact." Plaintiffs assert that the FEC's inaction has caused them to suffer both informational and organizational injuries. The Court begins (and ends) its standing analysis with plaintiffs' assertion of informational injury.[1]

"The law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." Campaign Legal Ctr. & Democracy 21 v. FEC, 952 F.3d 352, 356 (D.C. Cir. 2020) (per curiam) (cleaned up); see also AAN, 410 F. Supp. 3d at 12 ("The Supreme Court has long recognized that FECA creates an informational right—the right to know who is spending money to influence elections, how much they are spending, and when they are spending it.") (citing Akins, 524 U.S. at 24–25). The language of FECA demonstrates "a congressional intent to cast the standing net broadly." Akins, 524 U.S. at 19.

Right to Rise contests plaintiffs' alleged informational injury in two primary ways. *First*, it claims that plaintiffs have not been deprived any information because Right to Rise, Bush, and the Bush campaign have fully complied with FECA's disclosure requirements; and *second*, it argues that, regardless of whether plaintiffs have been deprived of any information, they cannot establish standing based on informational injuries because they cannot vote or engage in political activity. The Court will take each argument in turn.

---

[1] Because the Court finds that plaintiffs have suffered an informational injury, it does not address plaintiffs' contention that they have standing based on organizational injury and FEC delay.

*1. Disclosures required by FECA*

The Court begins with Right to Rise's claim that plaintiffs have no statutory right to additional disclosures. See Mot. to Dismiss at 9–12. Broadly speaking, plaintiffs allege that FECA requires further disclosures of two categories of information: (1) Bush's spending when he was (at the very least) testing the waters of a possible presidential bid; and (2) Right to Rise's in-kind contributions to the Bush campaign.

a. Testing-the-waters spending

Starting with the first category, plaintiffs assert that Bush has failed to disclose months of spending stemming from the testing-the-waters period of his nascent candidacy. See Resp. at 16–19, ECF No. 13. Specifically, plaintiffs allege that by January 2015, Bush was at *least* testing the waters of a viable presidential bid (and was perhaps a de facto candidate, as explained more fully below) and therefore was required to record and disclose all testing-the-waters spending in his first disclosure report. See 11 C.F.R. §§ 100.72(a), 100.131(a), 101.3. Right to Rise retorts that FECA requires no further disclosures and that Right to Rise, Bush, and the Bush campaign fully complied with FECA's reporting requirements. See Mot. to Dismiss at 10–11; Reply at 1–3, 5–6, ECF No. 15.

Right to Rise's rebuttal is premature at this stage in the litigation. The Court must consider whether FECA "on the *claimants'* reading" requires disclosure. Campaign Legal Ctr. & Democracy 21, 952 F.3d at 335 (emphasis added) (cleaned up). Here, claimants interpret FECA as requiring potential candidates to record testing-the-waters activities and disclose those activities if and when they subsequently become candidates. See 11 C.F.R. §§ 100.72(a), 100.131(a), 101.3. According to plaintiffs, Bush engaged in testing-the-waters activities as early as January 2015 but only disclosed them as of June 4, 2015. See Resp. at 17. Thus, on

10

plaintiffs' read of FECA, they have been deprived of over five months of information that is statutorily required to be disclosed.

Right to Rise strenuously denies that Bush was testing the waters prior to June 2015. See Mot. to Dismiss at 3, 9–10. But on a motion to dismiss, the Court must accept plaintiffs' factual allegations as true. See Ashcroft v. Iqbal, 554 U.S. 662, 678 (2009); see also Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169, 173 (D.C. Cir. 2006). Whether Bush did, in fact, begin testing the waters in January 2015 is a merits issue. When evaluating the present motion, then, the Court assumes that plaintiffs are correct that Bush was testing the waters as of January 2015. See AAN, 410 F. Supp. 3d at 13 (assuming truth of plaintiffs' allegation that political non-profit was operating as a "political committee" for purposes of motion to dismiss). Deprivation of the disclosures that FECA requires for that disputed period constitutes an informational injury to sustain Article III standing.

Plaintiffs further argue that at some point prior to formally declaring his candidacy, Bush moved beyond the "testing the waters" phase to become a de facto candidate. See Resp. at 16–21. Plaintiffs' administrative complaints are replete with possible indicia of a "shadow" campaign. See, e.g., May Admin. Compl. ¶¶ 3–10; Mar. Admin Comp. ¶¶ 45–49. That said, plaintiffs acknowledge that they are unaware when Bush's candidacy achieved this milestone, stating that "an investigation remains necessary to pinpoint when precisely Bush became a candidate and, consequently, when his FECA reporting obligations commenced." Resp. at 18.

It is unclear whether plaintiffs advance this argument as an alternative to their testing-the-waters theory of standing, or whether they assert it is an independent informational injury. Should it be the former, the Court need not reach the argument because it has already determined that plaintiffs have standing based on the alleged deprivation of Bush's testing-the-waters

disclosures. To the extent that Bush was *either* a de-facto candidate *or* testing the waters at some point prior to June 2015, then plaintiffs have alleged an informational injury because further disclosures would be required. Should it be the latter, however, plaintiffs point to no additional information that they would receive if Bush had decided to become a candidate, rather than just test the waters, at any given time. That is so because (as plaintiffs acknowledge) FECA requires that "all funds received or payments made in connection with" the testing-the-water exceptions "be considered contributions or expenditures" under FECA and "be reported in accordance with 11 C.F.R. [§] 104.3 in the first report filed by such candidate's principal campaign committee." 11 C.F.R. § 101.3. Thus, plaintiffs cannot claim informational injury based solely on the absence of information as to when Bush moved from testing the waters to mounting an undeclared campaign.

      b. Coordinated spending

  Plaintiffs next contend that they were deprived of information regarding the extent of in-kind contributions Bush received from Right to Rise, specifically in the form of coordinated spending. See Resp. 21–24. To support that contention, plaintiffs' complaint contains extensive allegations that Bush established Right to Rise to circumvent campaign finance laws. See, e.g., Compl. ¶ 26 (alleging that "Bush and his agents reportedly took a direct role in recruiting high-level staff for Right to Rise"); id. ¶ 27 (alleging that "Bush directly or indirectly 'controlled' and 'maintained' the super PAC while a candidate for office"); id. ¶ 28 (alleging that "Bush and his agents 'financed' Right to Rise Super PAC, and that Bush himself, his advisors, and members of his family personally conducted fundraising for the super PAC").

  It is undisputed that FECA designates coordinated payment for goods or services for a candidate's campaign as "contributions" under FECA. See 52 U.S.C. § 30116(a)(7)(B); see also

Colo. Republican Fed. Campaign Comm., 533 U.S. at 438. "By definition, these so-called coordinated expenditures are in kind—*viz*. not actual cash—contributions to the candidate." Campaign Legal Ctr. v. FEC, -- F. Supp. 3d --, 2020 WL 7059577, at *1 (D.D.C. 2020) ("CLC III"). In-kind contributions are therefore subject to FECA's contribution limits and source restrictions, 52 U.S.C. §§ 30116(a), 30118(a), are counted towards the $5,000 threshold that triggers candidate status, id. § 30101(2), and are required disclosures for both the contributor and the recipient, id. § 30104(b); 11 C.F.R. § 104.13.

Thus, if plaintiffs are correct that Bush (directly or indirectly) established Right to Rise, then Right to Rise was prohibited from making more than an aggregate of $2,700 in contributions or coordinated expenditures to the Bush campaign or using money raised from unions or corporations to fund any coordinated expenditures. See 52 U.S.C. §§ 30116(a), 30118, 30125(e). Additionally, Right to Rise's contributions and expenditures would have counted towards Bush's $5,000 candidacy threshold. As a result, on plaintiffs' telling a vast amount of Bush's campaign fundraising would be deemed illegal under FECA.[2] Both Right to Rise and the Bush campaign also would be required to provide detailed disclosures of each coordinated expenditure. See id. §§ 30104(b)(2), 30116(a)(7)(B). On this latter basis, plaintiffs claim that they have suffered an informational injury because "neither [Right to Rise] nor the Bush campaign disclosed *any* in-kind contributions between them, making it impossible to know the full scope of [Right to Rise's] financial relationship with the Bush campaign." Resp. at 23.

---

[2] For instance, plaintiffs' administrative complaint alleges that Right to Rise held events reserved for individual contributors of over $500,000, May Admin. Compl. ¶ 20, that Bush headlined "$100,000-a-head fundraisers," id. ¶ 23, and the Right to Rise was set to raise $100 million prior to Bush registering as a candidate, id. ¶ 24.

13

Even accepting plaintiffs' allegations as true, it is well-established that a plaintiff has no legally cognizable interest in a "legal conclusion that carries certain law enforcement consequences," Wertheimer v. FEC, 268 F.3d 1070, 1075 (D.C. Cir. 2001), nor in "forc[ing] the FEC to 'get the bad guys,'" Nader v. FEC, 725 F.3d 226, 230 (D.C. Cir. 2013) (quoting Common Cause v. FEC, 108 F.3d 413, 418 (D.C. Cir. 1997)).  Plaintiffs insist that they do not seek a legal conclusion, but rather information as to "*which* of Right to Rise's disbursements, in whole or in part, qualify as in-kind contributions to the Bush campaign."  Resp. at 3.  But plaintiffs' attempt to construe their request as being one for facts (rather than legal determinations) is precluded by Wertheimer, 268 F.3d at 1075.  There, the D.C. Circuit squarely held that there is no statutory right to determining whether an expenditure should be deemed a "coordinated" (and thus an in-kind) contribution under FECA.  Id.; see also CLC III, 2020 WL 7059577 at *9 (concluding that plaintiffs lacked standing to determine whether expenditures were coordinated with candidate); see also Free Speech for People v. FEC, 442 F. Supp. 3d 335, 344 (D.D.C. 2020) (same).  Although "[i]t is perhaps conceivable that certain facts are necessarily implied by the label 'coordinated,'" the court explained, a finding of coordination is, at bottom, "a legal conclusion that carries certain law enforcement consequences."  Wertheimer, 268 F.3d at 1075.

Plaintiffs distinguish Wertheimer on the grounds that the plaintiffs there already knew that the underlying expenditures were coordinated, whereas here, they do not know precisely what portion of Right to Rise's expenditures qualify as such.  See Resp. 24–25.  But this distinction is immaterial.  Wertheimer held that plaintiffs have no legally cognizable interest in labeling spending "coordinated" if that spending has already been disclosed in some format, 268 F.3d at 1075, which is precisely the case for the expenditures plaintiffs seek to uncover through

14

this lawsuit, see Resp. at 24 ("plaintiffs have reason to believe that much of Right to Rise's $118 million in total disbursements *should have been reported as in-kind contributions* to the Bush campaign") (emphasis added); id. at 27 ("plaintiffs are deprived of information *as to which of a super PAC's disbursements are actually in-kind contributions* to a 2016 presidential campaign) (emphasis added). Meanwhile, plaintiffs point to no additional expenditures or transactions that their requested information might bring to light.[3] The Court thus concludes that plaintiffs lack standing to determine which of Right to Rise's disbursements were coordinated with the Bush campaign.

2. *Voter status*

Right to Rise contends that even if FECA entitles plaintiffs to further disclosures, plaintiffs cannot claim an informational injury because they are "nonprofit entities . . . that cannot vote, have no members who vote, and cannot engage in partisan political activity." Mot. to Dismiss at 13. The Court disagrees.

Plaintiffs need not be voters to assert an informational injury under FECA. Campaign Legal Ctr. & Democracy 21, 952 F.3d at 356. In fact, the D.C. Circuit rejected this very argument when raised against the same plaintiffs presently before the Court. See id. (rejecting FEC's argument that plaintiffs cannot suffer informational injury because they are "[n]onprofits

---

[3] Plaintiffs note that, even if Right to Rise's disbursements were fully disclosed, Bush must have received additional in-kind contributions prior to his official campaign announcement because "[t]he campaign reported only $1,089" for in-kind contributions to cover travel, airfare, and lodging, which "cannot possibly account for Bush's reported zigzags around the country to meet with high-profile individuals and to attend countless fundraising events[.]" Resp. at 20 (citing March Admin. Comp. ¶¶ 20–23; May Admin. Compl. ¶¶ 10–11). To the extent plaintiffs seek Bush's pre-candidacy spending, however, that information overlaps with the disclosures discussed in Section III.A.1.a, supra. Regardless, plaintiffs support this assertion by pointing to allegations of further in-kind contributions from Right to Rise, which has already disclosed its disbursements.

15

that cannot vote, have no members who vote," and do not "engage in partisan political activity"). Likewise, in AAN, this Court rejected the defendant's argument that the plaintiff Center for Responsibility and Ethics in Washington ("CREW"), a similar government watchdog group, "suffered no cognizable injury . . . because it [could not] vote and, as a 501(c)(3) organization, [could not] engage in political activity." 410 F. Supp. 3d at 12. The Court explained:

> In Akins, the Supreme Court held that voters were injured where they claimed that information to which they were entitled under FECA "would help them (*and others to whom they would communicate it*) to evaluate candidates for public office." 524 U.S. at 21, 118 S.Ct. 1777 (emphasis added). The D.C. Circuit has since explained that a plaintiff suffers injury in fact "where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them." Friends of Animals v. Jewell, 824 F.3d 1033, 1040–41 (D.C. Cir. 2016) (internal quotation marks omitted). The helpfulness of the information does not depend on the plaintiff's status as a voter.

Id. at 13. Right to Rise claims that "AAN was limited to its facts," specifically a scenario where a plaintiff seeks disclosure of a 501(c)(4) organization's spending in support of candidates who, unlike Bush, ultimately hold office. See Reply at 4. But neither the Court's reasoning nor its clear statement that "[t]he helpfulness of the information does not depend on the plaintiff's status as a voter," AAN, 410 F. Supp. 3d at 13, was so constrained.

In fact, Right to Rise's argument is remarkably similar to that rejected in AAN. Like plaintiffs here, CREW "pled that it regularly reviews disclosure reports required by FECA and uses the information they contain regarding campaign expenditures for a host of programmatic activities[.]" Id.; see also, e.g., Compl. ¶ 16 (alleging that Campaign Legal Center "relies on the accurate and complete reporting of campaign finance information to carry out activities central to its mission, including the production of reports and other materials to educate the public about campaign spending and the true sources and scope of candidates' financial support"); id. ¶ 18 (alleging that Campaign Legal Center "uses its analyses of federal campaign finance disclosure

16

information to support its administrative practice at the FEC and before state and local campaign finance agencies, and to defend campaign finance laws in its active docket of cases in federal and state courts"); id. ¶ 21 (alleging that Democracy 21 "uses its analyses of federal campaign finance disclosure information to support its administrative efforts at the FEC, including its participation in advisory opinion and rulemaking proceedings").

Right to Rise resists the comparison to AAN because CREW specifically used the FECA disclosure reports at issue to find correlations between campaign spending and congressional activity, see AAN, 410 F. Supp. 3d at 13, which is impossible here given that "Bush suspended his presidential campaign more than four years ago and has not sought public office since," Reply at 7.  This is another distinction without a difference.  Finding correlations between campaign spending and congressional activity was but one of a "host of programmatic activities" advanced by disclosure of the information in AAN, 410 F. Supp. 3d at 13.  It does not follow that the specific programmatic activity highlighted in AAN is required for non-voter election watchdog organizations like plaintiffs to suffer an informational injury.

Rather, as the D.C. Circuit explained in Jewell, plaintiffs allege an informational injury where there is "no reason to doubt" that the statutorily required information would help them. 824 F.3d at 1040–41; see also AAN, 410 F. Supp. 3d at 12–13 (same).  This injury is not tethered to one particular programmatic activity but is instead rooted in the public's well-established "right to know who is spending money to influence elections, how much they are spending, and when they are spending it."  AAN, 410 F. Supp. 3d at 12.  Here, plaintiffs allege that the information's disclosure would help them produce complete and accurate public reports on campaign spending, support their public education efforts regarding the true sources and scope of candidates' financial support, advance their administrative practice at the FEC and before state

and local campaign finance agencies, and assist their established litigation practices in the area of campaign-finance compliance.  See Compl. ¶¶ 16–21; see also Campaign Legal Ctr. v. FEC, 245 F. Supp. 3d 119, 127 (D.D.C. 2017) (finding that plaintiffs pled an informational injury based on "a number of campaign-finance related activities—including public education, litigation, administrative proceedings, and legislative reform efforts—where the sought-after information would likely prove useful").  None of these activities depend upon whether Mr. Bush ultimately held office.

### B.  APA Claim

Right to Rise next argues that plaintiffs' APA claim (Count II) must be dismissed as precluded by FECA.  Plaintiffs do not meaningfully refute this argument.  Their response, relegated to one footnote, is: "Although plaintiffs maintain that the APA provides an alternative legal basis for challenging the Commission's inaction, they are agnostic as to whether the relief they seek is ultimately provided under FECA or the APA.  At this point in the proceedings, however, dismissal of the APA claim would be premature."  Resp. at 43 n.11 (citing CLC II, 466 F. Supp. 3d at 162).

It is well-settled that "where a party fails to respond to arguments in opposition papers, the Court may treat those specific arguments as conceded."  Dinkel v. MedStar Health, Inc., 880 F. Supp. 2d 49, 58 (D.D.C. 2012).  It is equally well-settled that a litigant may not "mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  Schneider v. Kissinger, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (cleaned up).  As a result, "a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace."  Id.  While the Court appreciates plaintiffs' candor in noting their agnosticism as to whether the APA might provide

18

relief, the Court must treat the argument as conceded given that plaintiffs have declined to meaningfully respond.

In any event, the Court concludes that FECA precludes review of plaintiffs' claim under the APA. See Citizens for Responsibility and Ethics in Wash. v. FEC, 164 F. Supp. 3d 113, 119 (D.D.C. 2015) ("CREW") (Cooper, J.). In CREW, the plaintiffs brought claims under FECA and the APA stemming from the FEC's dismissal of plaintiffs' administrative complaints. This Court dismissed the APA claims, explaining:

> FECA grants the FEC exclusive jurisdiction over civil enforcement of campaign finance laws, thereby channeling all complaints of campaign finance violations through the FEC. Similarly, FECA funnels all challenges to the FEC's handling of complaints through the U.S. District Court for the District of Columbia. Under the system of judicial review established by FECA, the Court can override the FEC's decision to dismiss a complaint if the dismissal was based on an impermissible interpretation of FECA or was arbitrary or capricious, or an abuse of discretion. This alternative, comprehensive judicial review provision precludes review of FEC enforcement decisions under the APA.

Id. at 119–20 (cleaned up). Here, plaintiffs challenge FEC inaction on their administrative complaints rather than FEC dismissal of their administrative complaints. But as plaintiffs concede elsewhere, courts treat challenges to FEC inaction and dismissal the same in the Article III context. See Resp. at 32 (collecting cases). The Court declines to depart from this reasoning and will therefore dismiss plaintiffs' APA claim (Count II). [4]

---

[4] Plaintiffs' passing reference to CLC II is inapposite. In CLC II, the parties disputed whether FECA provided an adequate remedy for plaintiffs' challenge to an FEC interpretation of a regulation. 466 F. Supp. 3d at 162. The court declined to dismiss plaintiff's APA claim because it alleged a "broader informational injury than their FECA count" and thus could involve a distinct standing analysis. CLC III, 2020 WL 7059577 at *9 (detailing plaintiffs' position at the motion to dismiss stage). Here, by contrast, plaintiffs have not differentiated the injuries suffered under their APA and FECA claims.

### IV. Conclusion

For the foregoing reasons, the Court will deny Right to Rise's motion to dismiss plaintiffs' FECA claim but will grant its motion to dismiss plaintiffs' APA claim. A separate Order will follow.

CHRISTOPHER R. COOPER
United States District Judge

Date: February 19, 2021